Moody v. HHS                    CV-92-657-B    03/31/94

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


<u>Jacqueline Moody</u>

    v.                                        Civ. No. 92-657-B

<u>Secretary of Health and Human Services</u>


**<u>O R D E R</u>**


    Jacqueline Moody challenges a final determination by the Secretary of Health and Human Services (the "Secretary") denying her application for Social Security disability benefits.  This Court has jurisdiction pursuant to 42 U.S.C.A. § 405(g) (West Supp. 1993).  Before me are Moody's motion to reverse the Secretary's decision and the Secretary's corresponding motion to affirm.  For the reasons that follow, I remand the case for further consideration by the Secretary.


**I.  <u>BACKGROUND</u>**

    Moody is a 57 year old woman with a high school education and a semi-skilled work history as a receptionist and PBX operator.  She alleges that she became disabled on December 31,

1990[1] due to a combination of allergies, foot problems, urinary frequency and mental stress.  I detail these medical problems <u>seriatim</u> and then briefly outline the testimony of the Secretary's vocational expert and the substance of the ALJ's decision.

A.    <u>Medical History</u>

**1)    Allergies**

Medical evidence indicates that Moody has allergic reactions to a wide range of substances, including plants, trees, grass, mold and fumes.  She also alleges that she is allergic to such things as paper, printers' ink, money, perfume, jewelry and air conditioning.  She tries to avoid all of the above substances, which she claims cause her sinus pain, chest pains that radiate down her arms, numb hands and pain in her legs and feet.  During the hearing, she stated that she had chest pains and her sinuses had become stuffy.

Dr. Siegel, an allergist who tested Moody in 1980 to determine what substances she was allergic to, believed that the pain Moody experienced was not related to her allergies, but to

---

[1]Moody has applied for, and has been receiving, unemployment insurance from that date.

mental stress related to her personal life.[2]  Moody's family
physician concurs in this diagnosis.  Moody's records also
indicate the allergies themselves may be treatable, but that she
refuses treatment for fear of increased symptoms.[3]

### 2)    Foot Problems

Moody has hammertoes on the second and fifth toes of each
foot that make her toes hit the tops of her shoes.  She has
undergone surgery on one toe, but she states that it actually
made the toe more painful.  As a result, she refuses surgery on
the other toes.

In addition to her hammertoes, Moody has bunions which cause
her feet to grow callouses.  She asserts that she can only afford
to get them removed once every few months, however, after they
are removed, Moody states that she can walk relatively
comfortably for two or three weeks.

---

[2]He recommended hospitalization at a psychiatric institution
but Moody refused.

[3]Moody stated at the hearing that she had previously sought
treatment in 1979, but that the treatment caused her condition to
worsen.  She "found that [she] was sensitive to more and more
different things", and after three months of treatment, could
hardly function.

3

The pain from her hammertoes and callouses[4] prevents Moody standing or walking for prolonged periods of time.  She is, however, able to clean her home, fix meals for herself and her husband, and go grocery shopping.  She frequently takes breaks from her chores to put her feet up.  She also leaves the heavy chores for her husband.

### 3)   Urinary Frequency

During her waking hours, Moody feels chronic pressure in her lower extremities that causes her to need to urinate approximately every 30 minutes.  She stated that she usually urinates five or six times before leaving her home, and then immediately upon arrival at her destination.  Her frequent need to urinate also makes it difficult for her to sleep.  Although she is not incontinent and testified that she can wait for up to an hour if going to the bathroom would be inconvenient, her frequency increases with stress.

Moody's treating physician, Dr. Riotta, feels that her symptoms may be caused by a large vaginal wall "prolapse."[5]

---

[4]Dr. Kazofsky, her treating physician, has not been able to explain why her callouses cause her pain.

[5]A prolapse is the inward sagging of an organ's walls.

4

However, he has told her that surgical correction of this anatomical problem may not correct her urinary frequency, which is essentially physiological. As a result, Moody has not yet consented to surgery.

### 4) Mental Stress

Moody has been diagnosed as having an anxiety/adjustment disorder with "mixed emotional features." Moody's disorder stems from a dependent personality and years of involvement in emotionally traumatic familial and marital relationships. Over the last few years the emotional pressures of these relationships have increased, causing Moody to breakdown more frequently. While treatment has improved her condition somewhat, her current counselor, Reverend Westhaven has stated that her problems "will not be corrected in a short duration."

Moody can "function appropriately and with independence" and has an active social life. However, bouts of anxiety and depression impair her task performance and "diminish her ability to stay on task." Moreover, stressful situations exacerbate her baseline disorder, "resulting in limitation of all aspects of coping and performance," as well as exacerbating her physical problems.

Moody testified that, as a direct result of her disorder, she was dismissed from her last three jobs for poor performance.[6] She stated that she would often get upset and cry, and that her emotional strain showed on her face. Moreover, she often had to leave her station for brief periods, or leave the office entirely and go home. On one occasion, her employer had to take her to the hospital because she was suffering from a panic attack. Finally, her emotional state would often cause her to be curt or unhelpful with customers. As a result of the above, Moody feels that "accumulated stress" prevents her from doing her old job.

Reverend Westhaven and Dr. Politz, the psychiatrist who supervises him, agree that Moody's disorder leaves "her work performance . . . severely impaired." However, Dr. Robert Rainie, a doctor hired by the Secretary to evaluate Moody, has concluded that Moody's adjustment disorder only slightly impairs her daily routines, social interactions and ability to stay on task.

---

[6]She worked as a receptionist at Hudson Bus Lines from 9/17/90 - 12/31/90; as a receptionist with Dyer Technologies from 2/14/89 - 2/14/90; and as a receptionist with Camelot Financial Services from 9/27/88 - 3/3/89.

B.    Vocational Expert's Testimony

At the hearing, the vocation expert testified that the bulk of Moody's employment has been sedentary and semi-skilled.  He also testified that, except for the receptionist's position, all of Moody's previous jobs (i.e., reservations clerk, mail clerk, PBX operator) were at the low end of the range of semi-skilled professions.

Before questioning the vocational expert about Moody's employability, the ALJ asked the expert to assume the following:

> We're dealing with a potential worker who is currently 55 years of age.  We're dealing with a potential worker who does have a high school education and a past semiskilled work background as you have indicated.  If we're dealing with someone who is physically capable of doing the lifting requirements of -- and, and carrying requirements of up to 20 pounds during the work day. If we're dealing with someone, however, who would be unable to do any longer standing or walking, let's say in excess of one hour, uninterrupted during the day. . . .   If we're dealing with individuals who are unable to, to work in environments where there would be excessive dust or fumes or gasoline or diesel odors or extremely poor ventilation and, and also if we're dealing with individuals that would be better suited to work in positions where they, were it was not an intensely stressful work environment . . . or where there was a constant or repetitive dealing with, with public, public with questions or public with problems in that aspect.

Based on these assumptions, the vocational expert opined that, assuming no debilitating environmental pollutants, Moody's

ability to return to her past work depended on the level of public interaction the work involved. The ALJ then provided some parameters:

> [i]f an individual in terms of dealing with the public is, is capable of interacting socially in a very responsible way. Is able to deal with people and to be polite with people as they would in their own personal life. But would be unable to deal with very stressful situations where they had to make quick decisions, where they had to have irate customers. . . .

Based upon these limitations, the expert concluded that Moody could return to her past work as a receptionist because she could pass customer complaints and other stress-producing problems on to someone higher up in the chain of authority.[7] However, he admitted that most employers would not retain a person who constantly broke down in front of customers, or if his or her emotional problems negatively affected the employee's work product.

---

[7]The expert also stated that such jobs existed in significant numbers in the national and New England economies.

C.   The ALJ's Decision[8]

In evaluating Moody's disability claim, the ALJ applied the
five part sequential process set out in 20 C.F.R. § 404.1520
(1993).  At step four, the ALJ found that Moody could return to
her past relevant work and therefore concluded that she was not
disabled.  More specifically, he found that:

> 1.   The claimant met the disability insured status
> requirements of the Act on December 31, 1990, the date
> the claimant stated she became unable to work, and
> continues to meet them through December 31, 1994.
>
> 2.   The claimant has not engaged in substantial
> gainful activity since December 31, 1990.
>
> 3.   The medical evidence establishes that the claimant
> has an adjustment disorder with mixed emotional
> features, bunion deformity with hammertoes of her feet
> and some allergy difficulties, but that she does not
> have an impairment or combination of impairments listed
> in or medically equal to one listed in Appendix 1,
> Subpart P, Regulations No. 4.
>
> 4.   The claimant has the residual functional capacity
> to perform work related activities except for work
> involving lifting over 20 pounds occasionally and 10
> pounds frequently, prolonged walking and standing for
> longer than one hour at a time, work requiring intense
> amounts of stress or work in excessive dust, fumes or

_____

[8]Moody filed an application for disability benefits on
January 23, 1991.  The Social Security Administration ("SSA")
initially denied her claim on March 20, 1991.  He request for
reconsideration was denied on June 18, 1991.  She then requested
and received a hearing before an Administrative Law Judge
("ALJ").

chemicals (10 C.F.R. § 404.1545).

    5.    The claimant's past relevant work as a receptionist did not require the performance of work related activities precluded by the above limitations(s) (20 C.F.R. § 404.1565).

    6.    The claimant's impairments do not prevent the claimant from performing her past relevant work.

    7.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. § 404.1520(e)).

On November 2, 1992, the Appeals Council declined to review the ALJ's decision, thereby rendering it subject to judicial review as a final decision of the Secretary. See 42 U.S.C.A. § 405(g).

### III.  DISCUSSION

Moody primarily attacks the ALJ's decision on the grounds that the ALJ misconstrued the record evidence and did not adequately explain his reasons for rejecting Moody's subjective pain complaints, her own descriptions of her physical limitations and the opinions of certain of her health care providers regarding the extent of her disability.[9]  Before addressing

---

[9]Moody also alleges that Secretary did not carry her burden of proving that Moody retained the residual functional capacity ("RFC") to engage in substantial gainful activity. See 20 C.F.R. § 404.1520 (1993).  In other words, she argues that, assuming her challenge to the ALJ's "no disability" conclusion at step four is successful, the ALJ's alternative finding of "no disability" at

10

these arguments, I set out the legal standards governing my review.

A.   Standard of Review

Pursuant to § 405(g), district courts are empowered to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In reviewing a Social Security decision, the Secretary's factual findings "shall be conclusive if supported by 'substantial evidence.'" Irlanda Ortiz v. Secretary of Health & Human Services, 955 F.2d 765, 769 (1st Cir. 1991) (quoting § 405(g)). The Secretary's findings must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Secretary's] conclusion.'" Id. (quoting Rodriquez v. Secretary of Health & Human Services, 647 F.2d 218, 222 (1st Cir. 1981)). It is the Secretary's responsibility to "determine issues of credibility and to draw inferences from the record evidence." Irlanda Ortiz, 955 F.2d at

step five is also unsupported by substantial evidence. I do not reach this argument because I find that the ALJ committed an error of law in calculating Moody's RFC at step four.

11

769.  Moreover, "the resolution of conflicts in the evidence is for the Secretary, not the courts."  Id.  With these principles in mind, I now turn to the specific arguments which Moody raises.

### B.   Substantial Evidence

At step four in the disability analysis, the ALJ must determine whether the claimant's impairment prevents her from returning to her past relevant work.  20 C.F.R. § 404.1565(a) (1993).  The burden is on the claimant to establish that she lacks the RFC to return to such work.  Gray v. Heckler, 760 F.2d 369, 371, 372 (1st Cir. 1985); Curtis v. Sullivan, 808 F. Supp. 917, 922 (D.N.H. 1992).  Here, the ALJ found that, while Moody presented evidence that she suffered from physical and mental impairments which significantly interfered with her ability to perform basic work activities, she retained the RFC to return to her past work as a receptionist.  Moody essentially alleges that the ALJ's conclusion misconstrues the record; consequently, she argues that his overall conclusion -- no disability -- was not supported by substantial evidence.  I disagree.

###### 1.  **Physical Impairments**

Moody contests the ALJ's conclusions regarding the severity of each of her three physical impairments.  First, she contends that, contrary to the ALJ's findings, her allergies imposed limits on her physical abilities beyond merely precluding work in office environments polluted by fumes, chemicals, dust or other serious pollutants.  The following facts, however, support the ALJ's contrary conclusion:  (1) there was absolutely no objective medical evidence supporting Moody's assertion that she was allergic to such office regulars as paper, ink and air conditioning; (2) Moody began having allergic attacks in 1979, yet continued to work as a receptionist for over ten years; and (3) Moody has not sought treatment for her allergies since 1980.  Given the above facts, substantial evidence supports the ALJ's conclusion as to the effect of Moody's allergies on her residual functional capacity.

Second, Moody argues that the ALJ erred in concluding that she could perform light work requiring walking or standing for up to one hour at a time.  However, there is substantial record evidence to support this conclusion as well.  Moody could go grocery shopping, cook meals, do light cleaning and loads of

13

laundry and otherwise perform tasks that might often take at least an hour. While Moody did testify that she rested quite often and put her feet up while at home, the time a typical receptionist spends sitting would provide similar opportunities for Moody to rest her feet. Indeed, despite having foot problems for some time, the record reveals only one day on which these problems caused her to miss work.[10] Thus while the ALJ recognized that her feet were undoubtedly painful, he also reasonably concluded that this pain did not preclude her from standing for the short periods of time usually required of a receptionist.

Finally, Moody claims that the ALJ incorrectly concluded that her urinary problem was not "ongoing" and "did not require treatment," and that she only needed to go to the bathroom six or seven times in a typical day. This argument essentially treats inartful phraseology as error. When viewed in context, however, the import of the ALJ's statements are clear. First, in stating that Moody's bladder condition was "not ongoing" and did not require treatment, the ALJ was merely stating that her bladder

---

[10]Moody had her callouses removed that day, and her feet were too tender to walk the long distance from where she parked her car to her work station inside her office building.

14

condition would not respond to ongoing treatment and was not severe enough to force Moody to consent to immediate surgery. Both of these conclusions are supported by substantial medical evidence and by Moody's own testimony.

Second, in stating that Moody's "frequency is only of about six or seven times a day", the ALJ obviously meant an eight-hour workday. Moody explicitly stated that she could wait for up to an hour before going to the bathroom if necessary, and the vocational expert stated that Moody would be able to hold a receptionist's position despite taking two or three unscheduled breaks a day. Based on this evidence, the ALJ could reasonably conclude that Moody could limit her frequency to six or seven times per workday, and that, with lunch and other scheduled breaks, she could accommodate these needs without endangering her job. Indeed, despite her urinary difficulties, Moody has worked as a receptionist for years. Her very ability to do the job despite her urinary frequency supports the ALJ's determination.

### 2. Mental Impairment

Moody alleges that the ALJ's "most flagrant violation of logic and common sense" is his determination that, while Moody's task performance might be somewhat impaired by anxiety associated

15

with her family and marital difficulties, these difficulties are not "work-related" and thus require only that she avoid intensely stressful jobs that might exacerbate her base stress levels. Moody claims that the ALJ's reasoning is fundamentally flawed because he fails to account for the fact that, irrespective of the source of Moody's difficulties, their effect is to preclude her from holding a job.

Substantial record evidence supports the ALJ's determination that Moody's emotional problems pose no limitation on her ability to perform the job tasks required of a typical receptionist. Admittedly, two of Moody's treating health care providers reached a contrary conclusion. However, where a treating physician's testimony is inconsistent with other substantial record evidence, this testimony is not entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2); Sitar v. Schweiker, 671 F.2d 19, 22 (1st Cir. 1982). In disregarding Westhaven and Politz's opinions, the ALJ reasonably relied upon (1) Dr. Rainie's statement that Moody's disorder only slightly impairs her daily routines, social interactions and ability to stay on task; (2) Moody's long work history; and (3) her range of daily activities.[11] Moreover,

---

[11]Besides performing typical household tasks, the ALJ found that Moody also functions well outside her home. For example,

16

based in part on evidence provided by Westhaven and Politz, the ALJ reasoned that Moody's adjustment disorder and related emotional outbursts were traceable primarily to her home situation, not work-related stresses. Given the above, there is substantial record support for the ALJ's conclusion that, while Moody could not work in a job which itself would unduly increase her baseline anxiety level, her mental impairments did not preclude her from performing the tasks required of a typical receptionist. See Irlanda Ortiz, 955 F.2d at 770 (consistent with SSR 85-15, mental impairment not disabiling if claimant remains able to cope with demands of work environment, such as need to be punctual, to attend work regularly and for the entire workday, and to accept supervision).

This conclusion, however, does not end the inquiry. A "finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he or she can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he or she finds for a significant period of time." Singletary v. Bowen, 798 F.2d 818, 822 (5th

she is very involved with her choir at church.

17

Cir. 1986); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). As a result, if a claimant presents facts raising this issue, the ALJ must make a finding not only that a claimant can obtain employment, but that he or she can maintain it. Singletary, 798 F.2d at 823. See also Moore v. Sullivan, 895 F.2d 1065, 1069 (5th Cir. 1990); Curtis, 808 F. Supp. at 925.

Here, Moody has introduced evidence that she was fired from three receptionist jobs in two years for the same reason -- her emotional problems prevented her from being able to carry out her duties in a satisfactory manner. She has thus raised the issue of her ability to maintain a receptionist's position if she were hired. While there is substantial evidence indicating that she could maintain such a position, the ALJ did not make a specific finding on this issue. Thus, I cannot determine whether the ALJ employed the correct legal standard in determining that Moody was able to return to her past relevant work. I therefore remand the case to give the ALJ the opportunity to clarify this issue. To further narrow the issue that the ALJ must address on remand, I go on to address Moody's final step four argument.

3. **Subjective Pain Complaints**

Based on Avery v. Secretary of Health & Human Services, 797 F.2d 19 (1st Cir. 1986), Moody alleges that the ALJ incorrectly discounted her subjective pain complaints relating to her allergies and feet.[12]  I disagree.

In determining the weight to be given to a claimant's allegations of pain, the First Circuit has stated that "complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings."  Dupuis v. Secretary of Health & Human Services., 869 F.2d 622, 623 (1st Cir. 1989) (citing Avery, 797 F.2d at 21). Moreover, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated his [or her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference. . . ." Frustaglia v. Secretary of Health & Human Services., 829, F.2d 192, 195 (1st Cir. 1987).

Here, the ALJ carefully considered Moody's pain complaints

_____

[12]Moody also argues that the ALJ did not accord adequate weight to Moody's account of the number of times she must urinate during the day or to the opinions of Dr. Politz and Reverend Westhaver regarding the severity of Moody's adjustment disorder and associated emotional problems.  These claims, however, are merely a confused restatement of arguments I have already addressed.  See Section II.B.1-2, supra.

19

as well as the relevant medical evidence concerning her allergies and foot problems. He identified the specific record evidence he relied upon to conclude that Moody's foot pain was not debilitating -- her activity level, her ability to go without treatment for almost two months at a time, and the relief she gets from sitting down for short periods. Moreover, Moody's doctor could not find objective medical support for the symptoms she allegedly suffered.

With respect to Moody's allergies, the ALJ explicitly discounted her pain complaints because, inter alia, he found her assertions of allergies to paper, ink and air-conditioning to be unsupported by any objective medical findings and otherwise incredible.[13] Moreover, although Moody claimed at the hearing to be suffering from shooting pains, the ALJ saw no visible evidence of this. Given the above evidence, I see no reason to question the ALJ's findings.

---

[13]These findings are borne out by evidence Moody introduced subsequent to the ALJ's decision. This evidence -- records from Moody's allergist of a decade ago -- indicate that she has never been tested for allergies to paper, ink, jewelry and air-conditioning. More importantly, the records indicate that the pains which Moody associates with her allergies is probably psychological and may result from stress.

20

### III.  CONCLUSION

For the foregoing reasons, I grant Moody's motion for reversal of the Secretary's decision denying her disability benefits (document no. 7) and remand the case for further consideration in light of this Order.  The Secretary's motion to affirm its decision is denied (document no. 8).

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

March 31, 1994

cc:  Elizabeth R. Jones, Esq.
     Gretchen Leah Witt, Esq.